UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BOOKER TORRENCE | : | CIVIL ACTION NO: 3:02CV497 (HBF) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| EDWARD PESANTI, M.D., GERMAIN | : | |
| BIANCHI, M.D., EDWARD | : | |
| BLANCHETTE, M.D. AND JOHN J. | : | |
| ARMSTRONG COMMISSIONER STATE | : | |
| OF CONNECTICUT DEPARTMENT OF | : | |
| CORRECTION | : | January 25, 2006 |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION
FOR LEAVE TO FILE AN AMENDED AND SUPPLEMENTAL COMPLAINT
AND TO ADD PARTIES**

On January 23, 2006, plaintiff, Booker Torrence ("Mr. Torrence") filed a

motion to file an Amended and Supplemental Complaint and to Add Parties. In support

of that motion, Mr. Torrence appended a proposed Fifth Amended Complaint.

Subsequent to the filing of this motion, with the proposed Fifth Amended Complaint,

plaintiff's counsel noted a clerical mistake in the proposed Fifth Amended Complaint.

At page 38, paragraph 104, Mr. Torrence inadvertently did not reallege for

Defendant, Dr. Buchanan, the same violations of Mr. Torrence's Fourteenth

Amendment  Equal Protection clause as alleged at page 4, paragraph 9 of the proposed

Fifth Amended Complaint.  The inadvertent mistake was clerical in nature.

     Attached hereto is a revised version of the Fifth Amended Complaint, which

remedies the clerical error and correctly states paragraph 104.

     For the foregoing reason, Mr. Torrence respectfully requests that this court

incorporate the *revised* Fifth Amended Complaint as part of the plaintiff's motion dated

January 23, 2006, and moves this Court for permission to file the Fifth Amended

Complaint.

PLAINTIFF,
BOOKER TORRENCE

By _____

Howard L. Pierce
Federal Bar No. ct10891
Gerald A. DeSimone
Federal Bar No.  ct24973
For Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT  06103-1919
Tel: (860) 251-5000
Fax: (860) 251-5318
email: hpierce@goodwin.com
email: gdesimone@goodwin.com
His Attorneys

## CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing Amended Complaint was mailed, postage prepaid, this 25th day of January, 2006 to:

Terrence M. O'Neill, Esq.
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105

Howard L. Pierce

425232 v.01

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BOOKER TORRENCE, | : | CIVIL ACTION NO. 3:02CV497 (HBF) |
| Plaintiff, | : | |
| v. | : | |
| | : | |
| EDWARD PESANTI, M.D., GERMAIN | : | |
| BIANCHI, M.D., EDWARD | : | |
| BLANCHETTE M.D, MARK BUCHANAN,: | | |
| M.D., JOHN J. ARMSTRONG | : | |
| FORMER COMMISSIONER, STATE OF | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| CORRECTION, AND THERESA C. | : | |
| LANTZ, COMMISSIONER, STATE OF | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| CORRECTION | : | |
| Defendants. | : | January 25, 2006 |

## FIFTH AMENDED COMPLAINT

Plaintiff, Booker Torrence ("Mr. Torrence"), by his attorneys, Shipman & Goodwin

LLP, for his Complaint in the above-entitled action alleges, with knowledge as to his own

acts, and otherwise on information and belief as follows:

## PRELIMINARY STATEMENT

1.     This is a civil action, commenced under 42 U.S.C. §1983 and the common

law, seeking declaratory relief and compensatory and punitive damages for defendants'

- 1 -

violation of Mr. Torrence's rights under the Eighth Amendment to the United States

Constitution to be free of deliberate indifference to his serious health care needs and to

equal protection of the laws as guaranteed by the Fourteenth Amendment to the United

States Constitution.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 42 U.S.C. 1983 and

28 U.S.C. §§1331 and 1343(b) in that the action arises under the laws of the United States.

3.      Venue is proper in this Court by virtue of 28 U.S.C. §1391, because the

events giving rise to the claims occurred in the District of Connecticut, and on information

and belief that all of the defendants reside in the District of Connecticut.

4.      This Court also has jurisdiction over this matter under the doctrine of

supplemental jurisdiction, pursuant to 28 U.S.C. §1367.

## PARTIES

5.      Plaintiff, Mr. Torrence, is and at all times pertinent herein, has been a citizen

of the United States and a resident of the State of Connecticut and until on or about July 11,

2005, a prisoner in the custody of the Connecticut Department of Correction ("DOC").

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

6.     Defendant, Edward Pesanti, is a medical doctor, and from on or about December 1, 1997 to on or about May 2002, the Medical Director for the University of Connecticut Health Center, Correctional Managed Health Care. As Medical Director, he was responsible for supervision of health care delivery to DOC inmates, which includes the institutions where Mr. Torrence has been incarcerated, and for the delivery of health care services consistent with the Eighth Amendment and the Equal Protection clause of the Fourteenth Amendment. He is sued in both his individual capacity and his official capacity.

7.     Defendant, Germain Bianchi, is a medical doctor, and at times pertinent herein, has been a medical doctor at Carl Robinson Correctional Institution and is directly responsible for the administration of health care services to DOC inmates consistent with the Eighth Amendment. Dr. Bianchi was Mr. Torrence's primary care physician at Carl Robinson Correctional Institution. He is sued in both his individual capacity and in his official capacity.

8.     Defendant, Edward Blanchette, is a medical doctor, and at times pertinent herein, was the State of Connecticut, Connecticut Department of Correction, Director of Clinical Services. Dr. Blanchette, as the DOC, Director of Clinical Services, was responsible for supervision of health care delivery to DOC inmates, which includes the

- 3 -

institutions where Mr. Torrence has been incarcerated, and for the delivery of health care services consistent with the Eighth Amendment and the Equal Protection clause of the Fourteenth Amendment. He is sued in both his individual capacity and his official capacity.

9.     Defendant, Mark Buchanan, is a medical doctor, and beginning in May 2002, the Medical Director for the University of Connecticut Health Center, Correctional Managed Health Care. As Medical Director, he is responsible for supervision of health care delivery to DOC inmates, which includes the institutions where Mr. Torrence has been incarcerated, and for the delivery of health care services consistent with the Eighth Amendment and the Equal Protection clause of the Fourteenth Amendment. He is sued in both his individual capacity and his official capacity.

10.     Defendant, John J. Armstrong, is the former State of Connecticut, Commissioner of the Connecticut DOC, and is responsible for the safe custody of all inmates in the Department of Corrections' custody and the provision of health care services to them consistent with the requirements of the Eighth Amendment and the Equal Protection clause of the Fourteenth Amendment. He is sued in his official capacity.

11.     Defendant, Theresa C. Lantz, beginning March 2003, is the current State of Connecticut, Commissioner of the Connecticut DOC, and is responsible for the safe custody

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

of all inmates in the Department of Corrections' custody and the provision of health care services to them consistent with the requirements of the Eighth Amendment and the Equal Protection clause of the Fourteenth Amendment.  She is sued in her official capacity.

12.     Defendants Edward Pesanti, M.D., Germain Bianchi, M.D., Edward Blanchette, M.D., Mark Buchanan, M.D., John J. Armstrong and Theresa C. Lantz are collectively referred to herein as ("Defendants").

## BACKGROUND

13.     Hepatitis is a disorder in which viruses or other mechanisms produce inflammation in liver cells resulting in an injury or destruction.  In most cases, this inflammatory process is triggered when the immune system fights off infections caused by viruses.

14.     Hepatitis C is a serious liver disease caused by the hepatitis C virus (HCV) which is found in the blood of persons who have this disease.  Hepatitis C is spread by contact with the blood of an infected person.

15.     The liver is the largest organ in the body.  It performs over 500 vital functions.  It processes all of the nutrients the body requires, including proteins, glucose, vitamins and fats.  Nearly every bodily process is affected by a damaged liver, including

- 5 -

digestive, hormonal, and circulatory systems. Without treatment, a damaged liver can result in encephalopathy, stomach and intestinal bleeding, or kidney failure, which may eventually develop with life-threatening consequences.

16.    Infection with the hepatitis C virus is one of the most important causes of chronic liver disease in the United States. At least 75 percent of patients with acute hepatitis C ultimately develop chronic infection, and most of these patients have accompanying chronic liver disease.

17.    Excluding incarcerated and homeless persons, approximately 28,000 people acquire infection of the hepatitis C virus every year and as many as 3.9 million Americans are chronic carriers of the virus. Again, excluding incarcerated and homeless persons, infections with the hepatitis C virus causes an estimated 8,000 to 10,000 deaths annually in the United States. The hepatitis C infection rate in the general population is believed to be 2 percent, while the hepatitis C infection rate among prisoners incarcerated in state correctional institutions is believed to be approximately 20 percent to 40 percent.

18.    The consequences of infection with the hepatitis C virus are the development of long term infections, chronic liver disease, cirrhosis of the liver (a potentially fatal scarring of the liver), cancer of the liver and death from liver failure.

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

19.     The natural history of chronic active hepatitis C begins with mild liver disease that progresses in stages overtime to more severe liver disease.  These stages progress from increased inflammation (autoimmune response) to necrosis (cell death) to liver fibrosis (scaring) to cirrhosis (liver failure) to hepatocellular carcinoma (liver cancer) and ultimately death.

20.     Epidemiological studies published in peer-reviewed medical literature document the association between the hepatitis C virus and diabetes.  The consequences of the association between hepatitis C virus and diabetes are an increased liver fibrosis stage and faster fibrosis progression rate.

21.     By early 1998, it had been firmly established in the medical community that African-Americans have a higher prevalence of hepatitis C infection than any other ethnic group, that African-Americans have higher rates of hepato cellular carcinoma and that the need for therapy is highest in the African-American population.

22.     The degree of progression of liver disease in chronic hepatitis C patients has been shown in peer-reviewed medical and scientific literature to be greater in patients with longer duration of infection.

**SHIPMAN & GOODWIN®** LLP  •  *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

23.    Chronic liver disease is the tenth leading cause of death among adults in the United States. It is estimated that 40 percent to 60 percent of chronic liver disease is due to infection with the hepatitis C virus.  Hepatitis C virus associated chronic liver disease is the most frequent indicator for liver transplantation among adults.

## FACTUAL ALLEGATIONS

24.    Since December 7, 1995, Mr. Torrence, an African-American male, has been diagnosed as infected with the hepatitis C virus.

25.    Mr. Torrence was received into DOC's custody in 1994 without a medical history of, or any indications or symptoms of infection with the hepatitis C virus.

26.    On January 27, 1994, Mr. Torrence was examined by DOC medical personnel at the Walker Reception Center, Suffield, Connecticut.  Blood was drawn and a laboratory blood analysis was conducted.  Mr. Torrence's DOC medical records reflect that this examination and blood analysis found no indication or presence of symptoms of infection with the hepatitis C virus.

27.    Beginning in 1995 to on or about July 2005, Mr. Torrence, while in DOC custody, DOC and The DOC's contract health care provider, University of Connecticut Health Center, Correctional Managed Health Care ("CMHC"), health practitioners,

- 8 -

supervisors, and administrators, at Cheshire Correctional Institution ("Cheshire"), Carl

Robinson Correctional Institution ("Carl Robinson") and Osborn Correctional Institute

("Osborn"), have denied him care for relief of his suffering and have delayed and interfered

with necessary screening and treatment -- all of which has resulted in deterioration of

function, avoidable pain, anxiety, and the reduced likelihood of favorable results from

medical intervention. After a delay of almost eight years, Mr. Torrence received treatment

for his hepatitis C virus infection. At that time, he was 51 years old, had a documented

history of type II Diabetes since 1995 and a liver biopsy documenting the existence of

advanced fibrosis of the cells of his liver. Mr. Torrence's therapy was unsuccessful in part

because of his delay in treatment. Defendants' callous indifference to Mr. Torrence's

serious medical needs, which has continued in an uninterrupted pattern from approximately

the middle of 1995 to approximately the middle of 2005, is detailed in part in the

paragraphs that follow.

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

**Contributing Factors in Defendants' Deliberate Indifference.**

28.     The unwarranted delays in Mr. Torrence's medical care have been fostered in part by administrative and systemic mis-management that made his suffering and delay in treatment inevitable, including:

a   Having Dr. Bianchi, a family practitioner, Mr. Torrence's physician primarily responsible for diagnosis and treatment of his infection with the hepatitis C virus while at Carl Robinson Correctional Institution.

b.   Extending the use of physicians already employed to evaluate and treat HIV inmates pursuant to a consent degree entered into approximately 15 years ago to additionally provide medical care for the evaluation and treatment of inmates with liver disease to include infection with the hepatitis C virus.

c.   Failure to provide for continuity of care, resulted in further delays. Continuity of care was adversely affected by defendants' failure to assure that Mr. Torrence's complete medical records moved with him,

- 10 -

to include laboratory test results, when he was transferred from one

correctional institution to another.

    d.    Defendants' fiscal concerns also influenced choice of providers and kept

Mr. Torrence from accessing specialists who were available.

**Defendants' Deliberate Indifference.**

    29.    During September, 1994, Mr. Torrence was assigned to the Cheshire

Correctional Institution, Cheshire, CT ("Cheshire"). While at Cheshire, Mr. Torrence

developed a serious, and life threatening medical condition, diabetic ketoacidosis. On the

morning of June 6, 1995, a DOC medical doctor ordered blood to be drawn and sent to a

medical laboratory for analysis. On or about June 7, 1995, the laboratory's written analysis

was delivered to Cheshire's medical unit. It reported that Mr. Torrence's blood had tested

positive for the hepatitis C virus (HCV).

    30.    On or about June 7, 1995, Mr. Torrence's laboratory results showing a

diagnosis of infection with the hepatitis C virus were placed into his official DOC medical

record.

    31.    One of the components of the June 7, 1995 laboratory blood analysis

requested the analysis of Mr. Torrence's CD4 T lymphocyte count. The laboratory results

- 11 -

indicated that the normal range for CD4 T lymphocytes is 423 CU.MM. to 1,724 CU.MM.

Mr. Torrence's CD4 T lymphocyte levels were decreased at 259 CU.MM. Decreased CD4

T lymphocyte levels indicate the presence of general infection, tissue damage or a virus.

      32.    During 1995, Dr. Blanchette was the Connecticut DOC, Director of Clinical

Services at the time Mr. Torrence tested positive for the hepatitis C virus. Dr. Blanchette as

Director of Clinical Services, and until on or about December 1, 1997, was responsible for

creating DOC medical policies consistent with generally accepted medical standards of care.

Dr. Blanchette was also in charge of the DOC's Medical Care Utilization Review

Committee. The DOC Utilization Review Committee was charged with ensuring that

prisoners received medical care in conformity with generally accepted standards of care

through both the coordination of health care by medical specialists and the approval and

monitoring of the continuity of care provided to prisoners.

      33.    On February 25, 1991, the United States Food and Drug Administration

("FDA") approved the drug Interferon for the treatment of the hepatitis C virus. Interferon

was the standard of care for the treatment of infection from the hepatitis C virus until 1998.

      34.    According to the State of Connecticut, Dr. Blanchette failed to create a DOC

medical policy for the consulting, screening and treatment of the hepatitis C virus. Dr.

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

Blanchette also failed to institute a policies directing medical doctors to disclose to hepatitis C infected patients that they had hepatitis C and to educate patients infected with the hepatitis C virus.

35.     On June 14, 1995, Mr. Torrence returned to Cheshire from an eight-day emergency inpatient hospital stay at St. Mary's Hospital, Waterbury, CT. Dr. Blanchette's failure to institute a DOC medical policy for the consulting, screening, and treatment of infections of the hepatitis C virus deprived Mr. Torrence of treatment for the disease and was callously indifferent to his serious medical needs, which did place and continues to place his life in jeopardy and has and continues to result in deterioration of function, as well as subjecting him to excessive and avoidable pain and anxiety.

36.     On June 14, 1995, because the DOC did not have a policy for the consulting, screening and treatment of the hepatitis C virus, DOC medical practitioners did not advise Mr. Torrence that he had tested positive for the hepatitis C virus. They did not counsel, monitor, screen or treat Mr. Torrence for his then DOC diagnosed disease, hepatitis C.

37.     Beginning on June 14, 1995, and continuing through and including December 31, 1995, Dr. Blanchette's failure to institute a DOC medical policy for the consulting, screening and treatment of the hepatitis C virus deprived Mr. Torrence of treatment for the

- 13 -

disease and was callously indifferent to his serious medical needs, which did place and continues to place his life in jeopardy and has and continues to result in deterioration of function, as well as subjecting him to excessive and avoidable pain and anxiety, and reduced likelihood of favorable results from medical intervention.

38.     Beginning on June 14, 1995, and continuing through and including December 31, 1995, because the DOC did not have a policy for the treatment of the hepatitis C virus infection, DOC medical practitioners did not advise Mr. Torrence that he had tested positive for the hepatitis C virus. They did not counsel, monitor, screen or treat Mr. Torrence for his then DOC diagnosed disease, hepatitis C.

39.     Beginning January 1, 1996, and continuing through and including December 31, 1996, Dr. Blanchette's failure to institute a DOC medical policy for the consulting, screening and treatment of the hepatitis C virus deprived Mr. Torrence of treatment for the disease and was callously indifferent to his serious medical needs, which did place and continues to place his life in jeopardy and has and continues to result in deterioration of function, as well as subjecting him to excessive and avoidable pain and anxiety, and reduced likelihood of favorable results from medical intervention.

- 14 -

40.    Beginning on January 1, 1996, and continuing through and including December 31, 1996, because the DOC did not have a policy for the treatment of the hepatitis C virus infection DOC medical practitioners did not advise Mr. Torrence that he had tested positive for the hepatitis C virus. They did not counsel, monitor, screen or treat Mr. Torrence for his then DOC diagnosed disease, hepatitis C.

41.    In March, 1997, the United States Department of Health and Human Services, National Institute of Health ("NIH") provided written guidance to the medical community on appropriate screening and treatment for the hepatitis C virus infection. Dr. Blanchette did not provide the DOC medical community with a policy for the screening and treatment of the hepatitis C virus infection.

42.    From March 1997, through on or about December 1, 1997, Dr. Blanchette's failure to institute a DOC medical policy for the consulting, screening and treatment of the hepatitis C virus deprived Mr. Torrence of treatment for the disease and was callously indifferent to his serious medical needs, which did place and continues to place his life in jeopardy and has and continues to result in deterioration of function, as well as subjecting him to excessive and avoidable pain and anxiety, and reduced likelihood of favorable results from medical intervention, and may have significantly shortened his life.

- 15 -

43.    Beginning March 1997, through on or about December 1, 1997, because the

DOC did not have a policy for the treatment of the hepatitis C virus infection, DOC medical

practitioners did not advise Mr. Torrence that he had tested positive for the hepatitis C virus

infection. They did not counsel, monitor, screen or treat Mr. Torrence for his then DOC

diagnosed disease, hepatitis C.

44.    On or about December 1, 1997, the University of Connecticut Health Center

entered into a managed health care contract with the DOC to supervise and provide

managed health care to Connecticut DOC prisoners.  At or about that time, the DOC

contract health care provider, Correctional Managed Healthcare Department ("CMHC")

was created within the University of Connecticut Health Center, and Dr. Pesanti became

primarily responsible for the supervision of managed health care within the Connecticut

DOC.  All DOC institution-based doctors were transferred from the DOC to the newly

created CMHC, University of Connecticut Health Center.  Dr. Blanchette remained with

the DOC as its senior physician however, now coordinating with Dr. Pesanti on DOC

prisoner clinical services issues.

45.    Dr. Pesanti is an official of the State of Connecticut, and former Medical

Director for the University of Connecticut Health Center, CMHC.  Dr. Pesanti was charged

- 16 -

with the supervision of medical care of all prisoners at Correctional institutions throughout the State of Connecticut. Dr. Pesanti was charged with the formulation, development, implementation and oversight of medical care administration and policy, directly affecting Mr. Torrence.

46. From June 1998, the United States FDA approved the use of a combination treatment protocol of Interferon and Ribavirin for the treatment of infections with the hepatitis C virus. The combination drug therapy involved the administration of Alpha-Interferon with an oral anti-viral agent Ribavirin. This treatment had been proven to be effective at clearing (sustained eradication) of the hepatitis C virus, therefore, mitigating its effects on the body. From June 1998 to on or about December 2001, this combination treatment was the standard of care for the treatment of the hepatitis C virus.

47. Dr. Pesanti, after becoming Medical Director for the University of Connecticut Health Center, CMHC, did not institute a policy for the consulting, screening and treatment of hepatitis C virus infection. Beginning on or about December 1, 1997 through October 16, 1998, Dr. Pesanti's failure to institute a policy for the consulting, screening and treatment of the hepatitis C virus deprived Mr. Torrence of treatment for the disease and was callously indifferent to his serious medical needs, which did place and

- 17 -

continues to place his life in jeopardy and has and continues to result in deterioration of function, as well as subjecting him to excessive and avoidable pain and anxiety, and reduced likelihood of favorable results from medical intervention, and may significantly shortened his life.

48.    Beginning on or about December 1, 1997 through October 16, 1998, because the University of Connecticut Health Center, CMHC did not have a medical policy for the treatment of the hepatitis C virus, CMHC medical practitioners did not advise Mr. Torrence that he had tested positive for the hepatitis C virus. CMHC medical practitioners did not counsel, monitor, screen or treat Mr. Torrence for his 1995 DOC diagnosed disease, hepatitis C.

49.    In October 1998, the United States Department of Health and Human Services, Center for Disease Control and Prevention ("CDC") published guidelines to the medical community for the appropriate treatment of hepatitis C virus infection. The CDC guideline was intended to serve as a resource for health care professionals, public health officials, and organizations involved in the delivery of clinical services.

50.    By the end of October 1998, Dr. Pesanti did author and provide to the CMHC medical community a medical policy drawn directly from both the 1997 NIH report

- 18 -

and the 1998 CDC guidelines. Despite the existence of a CMHC policy, defendants and CMHC health care professionals at DOC institutions failed to implement the policy. Mr. Torrence did not receive consultation, screening or treatment for his serious medical condition -- hepatitis C virus infection.

51.    Beginning on January 1, 1999, and through on or about June 9, 1999, Dr. Pesanti's CMHC policy prescribing the appropriate screening and treatment for the hepatitis C virus infection was in effect. Despite the existence of an appropriate CMHC policy, defendants and CMHC doctors with responsibility to provide primary care at DOC institutions failed to implement the policy. Mr. Torrence did not receive consultation, screening or treatment for his serious medical condition, hepatitis C virus infection.

52.    On or about, June 5, 1999, Mr. Torrence was transferred from Cheshire to Carl Robinson Correctional Institution, Enfield, CT ("Carl Robinson"). At Carl Robinson, CMHC Dr. Germain Bianchi became responsible for Mr. Torrence's primary health care.

53.    On June 9, 1999, Mr. Torrence underwent a medical screening examination at Carl Robinson. Mr. Torrence's blood was drawn and Dr. Bianchi ordered a medical laboratory blood analysis done on that blood.

SHIPMAN & GOODWIN® LLP • COUNSELORS AT LAW
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

54.     One of the components of the June 9, 1999 laboratory blood analysis ordered

by Dr. Bianchi requested the analysis of Mr. Torrence's alanine aminotransferase ("ALT")

levels (liver enzymes).  The laboratory results indicate that the normal range for ALTs is **8-

39 IU/Ls** (international units per liter).  Mr. Torrence's ALT levels were elevated at **153

IU/Ls**.  Elevated ALT levels indicate the presence of liver disease.

55.     Another component of the June 9, 1999 laboratory test ordered by Dr.

Bianchi requested the analysis of Mr. Torrence's aspartate aminotransferase ("AST") levels

(liver enzymes).  The laboratory results indicate that the normal range for AST levels is **17-

35 IU/Ls**.  Mr. Torrence's AST levels were elevated at **212 IU/Ls**.  Elevated AST levels

indicate the presence of liver disease.

56.     By the middle of June 1999, Dr. Bianchi, now himself on notice that

something was seriously wrong with Mr. Torrence's liver, neither informed Mr. Torrence

of his serious medical condition nor followed up to try and diagnosis and treat the root

cause of his medical condition.

57.     Mr. Torrence's medical records show that on June 11, 1999, Dr. Bianchi

scheduled a medical unit visit with Mr. Torrence for a respiratory problem.  At that time,

Dr. Bianchi did not discuss the results of the June 9, 1999 laboratory test.  Dr. Bianchi did

**SHIPMAN & GOODWIN**® LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

not advise Mr. Torrence that he was suffering from liver disease or counsel, monitor, screen or treat Mr. Torrence for liver disease.

58.    Mr. Torrence's medical records show that on June 14, 1999, Dr. Bianchi saw Mr. Torrence and ordered a chest x-ray for him.  The medical records show that, at that time, Dr. Bianchi did not discuss with Mr. Torrence the results of the June 9, 1999 laboratory tests.  Dr. Bianchi did not advise Mr. Torrence that he was suffering from liver disease or counsel, monitor, screen or treat Mr. Torrence for liver disease.  Dr. Bianchi made no attempt to diagnosis or treat the root cause of Mr. Torrence's liver disease.

59.    Mr. Torrence's medical records show that on January 14, 2000, Dr. Bianchi, saw Mr. Torrence for a respiratory problem.  The medical records show that, at that time, Dr. Bianchi did not discuss with Mr. Torrence the results of the June 9, 1999 laboratory tests.  He did not advise Mr. Torrence that he was suffering from liver disease or counsel, monitor, screen or treat Mr. Torrence for liver disease.  Dr. Bianchi continued to make no attempt to diagnosis or treat the root cause of Mr. Torrence's liver disease.

60.    Mr. Torrence's medical records show that on January 19, 2000, Dr. Bianchi re-ordered a hepatitis C virus screening test, almost five years after Mr. Torrence's DOC primary care health practitioners had been made aware that he was suffering from a serious

- 21 -

disease, the hepatitis C virus. Mr. Torrence's medical records reflect that the re-ordered test, re-diagnosed him with hepatitis C virus infection. Dr. Bianchi did not inform Mr. Torrence that he was infected with the hepatitis C virus. Dr. Bianchi contrary to CMHC medical policy did not counsel, monitor, screen or treat Mr. Torrence for his now re-diagnosed disease, Hepatitis C.

61.     Mr. Torrence's medical records show that two days later, on January 21, 2000, Mr. Torrence returned to the medical unit at Carl Robinson and was seen by Dr. Bianchi. Mr. Torrence was seen for a respiratory problem. At that time, Dr. Bianchi did not counsel, monitor, screen or treat Mr. Torrence for his now re-tested and re-diagnosed disease, hepatitis C.

62.     During February, 2000, a registered nurse that had been independently retained by Mr. Torrence examined Mr. Torrence's medical records, and discovered that DOC's medical records stated the Mr. Torrence had tested positive for the hepatitis C virus as early as June 7, 1995. On March 8, 2000, through counsel, Mr. Torrence notified the DOC, that he had been diagnosed in 1995 with the hepatitis C virus, and that this condition could lead to serious complications, including cirrhosis and carcinoma of the liver.

- 22 -

63.    On March 6, 2000, Mr. Torrence now aware and concerned about his serious medical condition requested to see Dr. Bianchi.  He was seen at Carl Robinson's medical unit by a nurse who wrote in his chart.

> "IM (inmate) requesting to see MD to discuss lab
>
> (laboratory) values.  IM anxious about elevated LFT's
>
> SGOT 39 SGPT 54 creatinine 1.3.  Will refer to MD for
>
> Reassurance"

64.    Later on morning of March 6, 2000, Mr. Torrence was seen by Dr. Bianchi.  Dr. Bianchi wrote in Mr. Torrence's medical chart

> "Lab (laboratory) work reviewed – mild elevation of
>
> ALT's – continue monitoring ALT's."

65.    On March 6, 2000, even though Dr. Bianchi now having received the results of Mr. Torrence's re-test and re-diagnosis of hepatitis C virus infection, and even though Mr. Torrence was anxious and requesting information and medical guidance from his primary care physician about his medical condition, neither the registered nurse nor Dr. Bianchi chose to provide that information.  Dr. Bianchi and the registered nurse chose to conceal this information from their patient, Mr. Torrence.

- 23 -

66.     Dr. Bianchi, now aware of Mr. Torrence's serious medical condition, knew or should have known that his decision would result in further unwarranted delay of medical treatment and callously and directly deprived Mr. Torrence of timely treatment for his infection with the hepatitis C virus.

67.     On January 9, 2003, Dr. Bianchi provided sworn testimony that in the spring of 2000, Dr. Blanchette assured Dr. Bianchi that Mr. Torrence would be treated for his infection with the hepatitis C virus and that Dr. Blanchette would take control of the "situation". Dr. Blanchette, therefore, recognized at that time, that Mr. Torrence needed treatment for his chronic hepatitis C disease. Dr. Bianchi testified that inmates in the late 1990s who knew they had hepatitis C and demanded treatment, or their families demanded treatment, were treated. Dr. Bianchi also testified that Dr. Blanchette would rather treat those who demanded treatment than "risk a lawsuit".

68.     In the spring of 2000, Mr. Torrence's medical records show that Dr. Bianchi never discussed with Mr. Torrence the root cause of his liver disease. Dr. Bianchi never discussed with Mr. Torrence his treatment options and never offered Mr. Torrence treatment.

- 24 -

69.    During 2000, neither the NIH nor the CDC amended, modified, or changed their guidelines for the screening and treatment of the Hepatitis C virus.

70.    On or about July 7, 2000, Dr. Pesanti, however, acting under color of law, authored and issued a second CMHC policy governing the treatment and non-treatment of prisoners with hepatitis C virus infection in all State of Connecticut DOC institutions. The development of this policy had a direct causal impact on the care available to Mr. Torrence, and callously deprived him of treatment for his infection with the hepatitis C virus.

71.    On information and belief, CMHC's July 2000, hepatitis C virus infection policy was not an exercise of medical judgment but was made for administrative and fiscal reasons. The CMHC July 2000 policy was fiscally designed to limit DOC medical expenditures, rather than ensuring compliance with the current medical standard of care.

72.    The CMHC July 2000 policy callously excluded prisoners from initial screening for treatment of the hepatitis C virus when their ALT levels were not equal to or greater than 100 IU/L's for a period of or greater than four to six months. The policy established medically unsupportably high thresholds for mere screening for eligibility for treatment of infection of the hepatitis C virus. This arbitrary exclusion existed without support from peer-reviewed medical literature, the NIH or CDC, and was considerably

- 25 -

beyond the range of the generally acceptable standard of medical care. This callous exclusion was recklessly and deliberately indifferent to the serious medical needs of Mr. Torrence resulting in denial of needed screening and treatment. Defendants knew or should have known that this policy would institutionalize, within the CMHC system, medical treatment which was below the standard of acceptable medical care.

73. The CMHC July 2000 hepatitis C policy adopted and implemented by the defendants and other medical practitioners treating patients at DOC institutions, was designed to exclude individuals from treatment, and in fact served to exclude Mr. Torrence from treatment. This lack of treatment was deliberately indifferent to Mr. Torrence's serious medical needs placed and continues to place Mr. Torrence's life in jeopardy and has and continues to result in a deterioration of function, as well as subjecting him to excessive and avoidable pain and anxiety, a reduced likelihood of favorable results from medical intervention, a lowered chance of survival, and psychological stress.

74. The CMHC July 2000 hepatitis C policy was in direct conflict with the policies established for individuals in other settings under the control of the State of Connecticut. The diagnosis and treatment of inmates was disparate from that of other non-inmates under the care of the State of Connecticut.

- 26 -

75.    This disparate treatment in the administration of medical care compared to similarly situated individuals served to violate a fundamental right by subjecting Mr. Torrence to deliberate indifference to his medical needs.  Moreover, the difference in treatment is neither rationally related to a legitimate state interest nor necessary to promote a compelling state interest.  In 2000, as a result of the disparate treatment, Mr. Torrence was not treated for the hepatitis C virus, which placed and continues to place Mr. Torrence's life in jeopardy and has and continues to result in a deterioration of function, the increase of fibrosis in his liver, as well as subjecting him to excessive and avoidable pain and anxiety, a reduced likelihood of favorable results from medical intervention, a lowered chance of survival and psychological stress.

76.    On January 19, 2001, the FDA approved the combination drug therapy of Peginterferon Alpha 2a and Ribavirin for the treatment of the hepatitis C virus.  This type of combination therapy then became the standard of care for the treatment of chronic hepatitis C.

77.    On April 24, 2002, Mr. Torrence underwent a liver biopsy examination.  A liver biopsy is a surgical procedures with serious risks and potential complications, such as puncture of the lungs or gallbladder, infection, uncontrolled internal bleeding and pain.  A

SHIPMAN & GOODWIN® LLP  •  COUNSELORS AT LAW
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

liver biopsy was conducted by medical personnel providing services under CMHC contract. The liver biopsy procedure involves inserting a long 18 gauge hollow needle, through the skin of the patient guided by ultrasound imaging from the front or side of the torso under the rib cage, reaching the liver, and then piercing the organ, and collecting small pieces of tissue for pathological review. The entire procedures takes approximately 30 minutes. The purpose of a liver biopsy is to determine the degree of inflammation, necrosis, fibrosis, or cirrhosis in the liver.

78.     On April 25, 2002, a surgical pathology report was prepared of Mr. Torrence's biopsied liver tissue. The examining physician, Dr. Forouhar, wrote,

> "PERTINENT CLINICAL INFORMATION:
>
> + HEPATITIS C (IDDM).
>
> DIAGNOSIS:  Liver biopsy:  Chronic Hepatitis, mildly
>
> active with features consistent with hepatitis C associated
>
> chronic liver disease.
>
> COMMENTS:  Piecemeal necrosis and mild and focal.
>
> **Portal fibrosis is Stage III/V.**  Portal inflammation is
>
> mild to moderate with occasional lymphoid nodule

- 28 -

**SHIPMAN & GOODWIN®** LLP  •  *COUNSELORS AT LAW*

ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

> inflammation. Bile ducts are normal in number and show
>
> reactive changes. Hepatic lobules show mild to moderate
>
> degree of lobular hepatitis. Mild focal fatty
>
> metamorphosis is noted. Central veins show minimal
>
> increase in collagen. Iron stain show no increased iron."

79.    On May 17, 2002, Dr. Bianchi, after reviewing the results of the liver biopsy, requested the CMHC hepatitis C Utilization Review Committee review Mr. Torrence's case for treatment of infection with the hepatitis C virus. Dr. Bianchi also requested that Mr. Torrence receive a "GI [gastroenterology] clinic follow-up". The hepatitis C Utilization Review Committee, established by Dr. Buchanan, is comprised of Dr. Gittzus, Dr. Blanchette, and Dr. Frederick Altice, Yale Infectious Disease Department AIDs Project, New Haven, CT. These three doctors are infectious disease doctors and also comprise the CMHC HIV Utilization Review Committee.

80.    On information and belief, Dr. Buchanan established the Hepatitis Utilization Review Committee with the physicians he selected was not an exercise of medical judgment but was made for administrative and fiscal reasons. It was designed to limit DOC medical expenditures rather than ensuring compliance with the current medical standard of care.

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

81.     On May 30, 2002, the CMHC Hepatitis C Utilization Review Committee confirmed Mr. Torrence's diagnosis of infection from the hepatitis C virus and approved a gastroenterology clinic follow-up.  The Utilization Review Committee's decision was reviewed by a University of Connecticut Health Center-based physician and was approved on June 30, 2003.

82.     During the late summer of 2002, Mr. Torrence was transferred from Carl Robinson to Osborn.  At Osborn, CMHC Dr. John Gittzus became responsible for the supervision of treatment of Mr. Torrence for infection from the hepatitis C virus.

83.     Mr. Torrence's medical records indicated that he was never scheduled for his gastroenterology consultation, even though it was recommended and approved on the heels of his liver biopsy.

84.     Mr. Torrence's treatment for his hepatitis C did not begin until January 24, 2003, more than 91 months after the need was known for treatment.

85.     On October 6, 2003, Mr. Torrence's laboratory blood analysis report showed that he was successfully responding to the treatment and effectively clearing the hepatitis C virus from his liver.

- 30 -

86.    Mr. Torrence's medical records show that during his course of treatment he developed a side effect from the treatment, hyperthyroidism. The hyperthyroidism however, was effectively controlled through drug therapy and his treatment for hepatitis C infection was continued uninterrupted.

87.    During December 2003, Mr. Torrence completed the prescribed course of drug therapy treatment.

88.    On or about February 23, 2004, Mr. Torrence underwent a laboratory blood analysis to determined if he was continuing to sustain his positive viral response to the hepatitis C virus. The laboratory results indicated that was not the case. The virus had returned to his liver.

89.    On or about December 3, 2004, Dr. Gittzus scheduled Mr. Torrence for a second liver biopsy procedure. The surgical procedure was conducted on December 7, 2004, eleven months after the completion of treatment. At that time, there was no supportable medical reason for Mr. Torrence to have been subjected to a second surgical liver biopsy procedure. The surgery was unwarranted because the first biopsy already had established that Mr. Torrence had advanced disease with hepatic fibrosis and it was now established that the hepatitis C virus had returned. During the course of the second surgery,

- 31 -

the needle that was intended to collect liver tissue was pushed through Mr. Torrence's gallbladder, prior to reaching his liver. This puncture of the gallbladder caused bile to seep into Mr. Torrence's peritoneal cavity. This resulted in a serious medical emergency and had a significant and debilitating effect on Mr. Torrence. It subjected him to excessive and avoidable pain, anxiety and caused psychological stress.

90.    On December 7, 2004, the medical emergency required Mr. Torrence to be immediately hospitalized in the Intensive Care Unit ("ICU") at John Dempsey Hospital for 6 days, from December 7 through and including the morning of December 13, 2004.

91.    During Mr. Torrence's hospitalization in the ICU at John Dempsey Hospital, he was seen and examined by Dr. Herbert Bonkovsky, the attending gastroenterologist and noted liver specialist at the University of Connecticut Health Center. At that time, Dr. Herbert Bonkovsky wrote in part in Mr. Torrence's chart,

>   "Liver Attending:  12/11/04,
>
>   Comments:  -by history, patient took peg interon and
>   Ribavirin X 1 year with complete response.  Relapse.
>   -biopsy shows moderate CAH, plus fibrosis
>   -tolerated previous therapy well

- 32 -

**SHIPMAN & GOODWIN®** LLP •  *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

> PLAN:  retreat with 1 yr of either Pagsys 180 mcg every
>
> week OR interferon 9 mcg every day and Ribavirin 600
>
> mg 2x day.  Okay for discharge 12/12/04"

92.    The medical care deemed appropriate and prescribed for Mr. Torrence by Dr. Bonkovsky, was refused Mr. Torrence.

93.    CMHC Dr. Gittzus, a member of the Hepatitis C Utilization Review Committee, determined that even through Dr. Bonkovsky had advised to immediately begin another course of drug combination therapy, and even though Mr. Torrence had his thyroid condition adequately controlled during his first course of treatment, and that he had consistently and effectively responded to the treatment, thereby reducing the hepatitis C viral load to a diminnuous level, Dr. Gittzus and the Utilization Review Committee denied Mr. Torrence an opportunity to continue his treatment.  They determined that Mr. Torrence must wait before they would consider re-treating for his hepatitis C virus infection.

94.    Dr. Buchanan extended the scope of CMHC HIV Utilization Review Committee to also encompass treatment decisions for inmates infected with hepatitis C virus.  Diseases of the liver are not the focus of these physicians' medical expertise.  Dr. Buchanan failed to provide physicians with the appropriate and adequate training to make

**SHIPMAN & GOODWIN®** LLP  •  *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

informed treatment decisions dealing with liver disease. This situation is demonstrated in

Dr. Gittzus' chart entries of June 9 and June 30, 2004, dealing with his indecision to re-

treat Mr. Torrence. He wrote in part the following on June 9:

> "6/9/04 Interferon/Graves Disease . . .
>
> HCV Relapse
>
> UCONN HAS APPROVED PEGASYS RETREATMENT
>
> FOR PEG INTERON FAILURES. HE MAY HAVE
>
> BETTER RESPONSE SINCE HE WAS EARLY
>
> RESPONDER
>
> ? WHAT WOULD PEGASYS DO TO THYROID!"

95.     On June 30, 2004, Dr. Gittzus still unsure and uncertain of how to proceed

with the treatment of Mr. Torrence consulted with neither the liver specialist at the

University of Connecticut Medical Center, who recommended re-treatment of Mr.

Torrence's chronic hepatitis C condition, nor a University of Connecticut Center

Endocrinologist. Dr. Gittzus does not send Mr. Torrence to the University of Connecticut

Medical Center for an evaluation with a gastroenterologist or endocrinologist. Instead Dr.

Gittzus chooses to attend a meeting of gastroenterologists who were discussing the hepatitis

SHIPMAN & GOODWIN® LLP • COUNSELORS AT LAW
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

C virus. He then proceeds to discuss his re-treatment concerns with one of the attendees who had access to neither the medical records nor the patient, and then on June 30, writes in Mr. Torrence's chart, in part, the following:

> "1.    Most had seen both graves and thyroiditis.
>
> 2.    Course was variable.  Most resolved off INF but took time  -- 6-12 weeks?
>
> 3.    Decreasing Tapazole requirements appeared an optimistic sign
>
> 4.    What PEGASYS would do to Graves stability was unknown
>
> 5.    ReRx was risk/_____ situation .. if liver biopsy showed advanced disease prob should be re-treated since HCV is ultimately fatal condition and hyperthyroidism isn't .. if mild on biopsy, defer until Graves resolved (with or without RAI)"

- 35 -

96.    Dr. Gittzus, a member of the hepatitis C Utilization Review Committee decided not to re-treat Mr. Torrence. Mr. Torrence was eligible for discharge from prison in less than one year, approximately July 2005. Dr. Gittzus told Mr. Torrence that if he wanted to be re-treated, he would have to voluntarily agree to be incarcerated during the full course of his treatment, approximately 48 weeks. It was explained to Mr. Torrence that it was a DOC rule that could not be broken. Mr. Torrence, after being incarcerated since 1994, chose to be released.

97.    On information and belief, this 12-month additional incarceration period rule for treatment for hepatitis C, although presented to Mr. Torrence as inflexible, is in fact a flexible rule. Inmates who have been near their discharge time, who have demanded treatment, were often treated and discharged from prison on schedule. This option was never offered Mr. Torrence.

98.    Defendants Doctors Pesanti, Blanchette, Buchanan, and Commissioners Armstrong and Lantz were deliberately indifferent to Mr. Torrence's serious needs, as shown, inter alia, by their denying Mr. Torrence access to specialists, by their failure to provide systems, oversight and management of health care delivered by practitioners outside DOC institutions, particularly when, as here, a patient's care requires coordination of care.

- 36 -

99.    By 1998, combination Interferon and Ribavirin therapy was readily available. No therapy however, was provided until 2003 when Mr. Torrence had more hepatic fibrosis and inflammation from a combination of untreated hepatitis C, diabetes mellitus as well as advancing age. These factors made it less likely for a sustained response in 2003.

100.    In 2004, when Mr. Torrence had been diagnosed a post-hepatitis C therapy relapser, there was again an unwarranted delay in consideration of starting Mr. Torrence on a second course of treatment, even though a second course of treatment had been approved for him by Dr. Bonkovsky during December of 2003.

### Defendants Responsibilities

101.    Defendant, Edward Pesanti, a medical doctor, was, at times pertinent herein, directly deficient in formulating and implementing policy for medical care, which was consistent with the standard of care of the medical community, the Eighth Amendment and the equal protection clause of the Fourteenth Amendment.

102.    Defendant, Edward Blanchette, a medical doctor, was, at times pertinent herein, directly deficient in formulating and implementing policy for medical care, which was consistent with the standard of care of the medical community, the Eighth Amendment and the equal protection clause of the Fourteenth Amendment.

**SHIPMAN & GOODWIN®** LLP •   *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

103.    Defendant, Germain Bianchi, a medical doctor, at Carl Robinson, was, at times pertinent herein, directly deficient as Mr. Torrence's primary care physician, in carrying out his responsibility for the administration of health care services to Mr. Torrence consistent with the standard of care of the medical community and the Eighth Amendment.

104.    Defendant, Mark Buchanan, a medical doctor was, at times pertinent herein, directly deficient in formulating and implementing policy for medical care, which was consistent with the standard of care of the medical community and the Eighth Amendment and the equal protection clause of the Fourteenth Amendment.

105.    Defendant, John J. Armstrong, former Commissioner of the Connecticut Department of Corrections, was, at times pertinent herein, deficient in carrying out his responsibilities for the safe custody of Mr. Torrence and for the provision of health care services to Mr. Torrence consistent with the requirements of the Eighth Amendment and the equal protection clause of the Fourteenth Amendment.

106.    Defendant, Theresa C. Lantz, Commissioner of the Connecticut Department of Corrections, was, at times pertinent herein, deficient in carrying out her responsibilities for the safe custody of Mr. Torrence and for the provision of health care services to Mr.

- 38 -

Torrence consistent with the requirements of the Eighth Amendment and the equal protection clause of the Fourteenth Amendment.

107.    The actions and in-actions of the defendants acting under color of state law, described above have deprived Mr. Torrence of timely screening, and treatment for infection of the hepatitis C virus. This lack of screening, treatment and the unwarranted delay in treatment was deliberately indifferent to Mr. Torrence's serious medical needs and has placed and continues to place Mr. Torrence's life in jeopardy and has and continues to result in a deterioration of function, as well as subjecting him to excessive and avoidable pain and anxiety, psychological stress, a reduced likelihood of favorable results from medical intervention, and a lowered chance of survival.

108.    The actions and inactions of the defendants described above were extreme and outrageous and were carried out with the knowledge they would or probably would cause Mr. Torrence extreme emotional distress.

109.    The actions of the defendants described above are shocking to the conscience.

110.    The actions of the defendants described above are adverse to social standards of decency.

**SHIPMAN & GOODWIN®** LLP  •  *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

## INJUNCTIVE RELIEF REQUIRED

111.    The Plaintiff is suffering irreparable harm by virtue of defendants' injuries to his health.

112.    The defendants should be required to provide Mr. Torrence with the medical treatment a second course of hepatitis C drug combination therapy.

113.    If defendants are permitted to continue to provide medical services in the same manner described above, Mr. Torrence will suffer additional harm for which he will have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF

114.    Mr. Torrence repeats and re-alleges each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

115.    By their actions and failure to act, defendants, acting under color of state law, deprived Mr. Torrence of his right to be free of deliberate indifference to his serious medical care needs, in violation of the Eighth Amendment to the United States Constitution and 42 U.S.C. §1983.

- 40 -

## SECOND CLAIM FOR RELIEF

116.    Mr. Torrence repeats and re-alleges each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

117.    As a direct and proximate result of defendants' actions and omissions, Mr. Torrence's pain was unnecessarily prolonged.  Mr. Torrence's treatment was unnecessarily delayed, placing his very life in jeopardy, which has resulted in deterioration of function, anxiety, increased likelihood of medical complications in the future and he was caused to suffer extreme emotional distress then, now, and in the future.

## THIRD CLAIM FOR RELIEF

118.    Mr. Torrence repeats and re-alleges each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

119.    By their actions and failure to act, defendants Pesanti, Blanchette and Armstong, acting under color of state law, deprived Mr. Torrence of his right to equal protection, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §1983.

**SHIPMAN & GOODWIN®** LLP • *COUNSELORS AT LAW*
ONE CONSTITUTION PLAZA • HARTFORD, CONNECTICUT 06103-1919 • (860) 251-5000 • FAX (860) 251-5099 • JURIS NO. 57385

## RELIEF REQUESTED

WHEREFORE, the Plaintiff, Mr. Torrence, demands Judgment against defendants named in each claim for relief, jointly and severely as follows:

a.      A declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the actions of the defendants described above constituted violation of Mr. Torrence's rights under the Eighth Amendment to the United States Constitution to be free of deliberate indifference to his serious health care needs as well as a violation of Mr. Torrence's rights under the Fourteenth Amendment Equal Protection Clause to the United States Constitution;

b.      Compensatory damages in the amount this court shall consider to be just, reasonable and fair;

c.      Attorney fees and the costs of this action pursuant to 42 U.S.C. §1988;

d.      Punitive damages in an amount this court shall consider to be just, reasonable and fair;

- 42 -

      e.      A permanent injunction prohibiting defendants in the future from providing medical services in the same manner to Mr. Torrence and requiring adequate and timely medical care for Mr. Torrence; and

      f.      Such other relief as this court shall consider to be fair and equitable.

PLAINTIFF,
BOOKER TORRENCE

By _____

Howard L. Pierce
Federal Bar No. ct10891
Gerald A. DeSimone
Federal Bar No.  ct24973
For Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT  06103-1919
Tel: (860) 251-5000
Fax: (860) 251-5318
email: hpierce@goodwin.com
email: gdesimone @goodwin.com
His Attorneys

- 43 -

### CERTIFICATION OF SERVICE

I hereby certify that a copy of the foregoing Fifth Amended Complaint was mailed, first class mail, this 25th day of January, 2006 to:

Terrence M. O'Neill, Esq.
Assistant Attorney General
110 Sherman Street
Hartford, CT  06105

_____
Howard L. Pierce

424692 v.01

- 44 -